IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

JILL ALEXANDER, as Personal          CASE NO. 2:16-cv-14422-XXXX
Representaitve of the Estate of MITCHELL
BRAD MARTINEZ, deceased,

       Plaintiff(s),

v.

DERYL LOAR, in his official capacity as
Sheriff of Indian River County, Florida, and
CHRISTOPHER SHARKEY, in his official
capacity as a deputy of the Indian River
County Sheriff's Office,

       Defendant(s).
_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT LOAR'S MOTION FOR FINAL SUMMARY JUDGMENT

COMES NOW the Plaintiff, JILL ALEXANDER (the "Plaintiff"), as Personal Representaitve of the Estate of MITCHELL BRAD MARTINEZ, deceased (the "Decedent"), by and through the undersigned attorneys, hereby files this Response and Memorandum of Law in Opposition to the Motion for Final Summary Judgment (the "Motion" or the "Motion for Summary Judgment") filed by the Defendant, Sheriff DERYL LOAR ("Defendant Loar" or "Loar"), and states:

### Introduction

This is a wrongful death, § 1983, negligence action arising from the unwarranted death of the Decedent while in the custody of the Indian County Sheriff's Office. As established through the undisputed summary judgment evidence, the Decedent's wrongful death occurred solely because of the Defendants' actions while the Decedent was in their sole custody. In an attempt to skirt his

CASE NO. 2:16-cv-14422-XXXX
*Page 2*

responsibility for the Decedent's wrongful death, Defendant Loar has filed his Motion for Summary Judgment, contending that summary judgment is proper as to the Plaintiff's 42 U.S.C. § 1983 and negligence claims against him.  However, as explained further below, summary judgment is improper because there are genuine issues of material fact as to whether Loar caused the Decedent's death by failing to train and supervise its employees in the transport of persons in custody and in the use of force, precluding summary judgment as to the Plaintiffs 42 U.S.C. § 1983 and negligence claims against Sheriff Loar.  Further, Plaintiff's claim against Loar for negligent training is not precluded by the doctrine of sovereign immunity because the Plaintiff's challenge goes to the fact that Loar negligently trained his supervisors, an operational level decision, and not as to what was included in the training program, i.e., a discretionary or planning level decision.

## Statement of Disputed Material Facts

**What Happened? – The Nature of the Case**

1.      The Decedent, then-37-years-old and in plain clothes, appeared in court for a bond hearing at the Indian River Courthouse in Indian River County ("IRC"), Florida.  *See* Pl.'s Disclosure of Expert, Roy R. Bedard[1] ("Bedard Disclosure") at ¶¶ 1-2, [D.E. 46 at Exhibit A thereto].  The Decedent's bond was revoked and the court ordered that the Decedent be remanded into the custody of the IRC's Sheriff's Office for transport to the IRC Jail.  Bedard Disclosure at ¶ 5.

2.      The Decedent was transported from the courtroom to the intake area, and handcuffed in front of his body using a handcuff belt in preparation for transport.  Bedard

---

[1]  Bedard is a full-time professional law enforcement and corrections trainer and consultant, and conducts law enforcement, corrections, and public safety training throughout the world.  He received a bachelor's degree from Florida State University in Criminology and Criminal Justice and a Master's Degree in Educational Psychology.  He is currently a Doctoral student at FSU pursing a Ph.D in Educational Psychology.  For the past twenty-nine years, he has served as a full-time police officer, police trainer, and reserve officer.  In preparation for his report, Bedard examined an extensive amount of materials relevant to this case, including pleadings, expert reports, autopsy reports, depositions, pictures, videos, etc.  *See* Bedard Disclosure at pp. 4-7.

Disclosure at ¶¶ 6-8.  The Decedent was then placed in leg shackles and put in a holding cell to await a transport van.  Bedard Disclosure at ¶ 11.  "All deputies that had contact with [the Decedent] reported that he appeared to be fine.  He was talking normally and not exhibiting any signs of distress."  Bedard Disclosure at ¶ 12.

      3.    "Defendant IRC Deputy Christopher Sharkey arrived at the courthouse in the transport van #118.  He was traveling alone."  Bedard Disclosure at ¶ 13.  "Sharkey loaded seven prisoners into the rear of the transport van #118 through the back door," and "placed [the Decedent] into the transport van, into a solitary compartment directly behind the driver's compartment."  Bedard Disclosure at ¶¶ 14-15.  "Though surveillance cameras were installed in the sally part, the video froze intermittently as [the Decedent] was about to enter the van."  Bedard Disclosure at ¶ 16.  Specifically, in the video, before freezing, the Decedent is seen entering the van as follows:



The video then freezes and does not otherwise depict how the Decedent was placed in the van, nor does it show what occurred while/immediately after he was loaded in.  Indeed, the ***very next*** frame is of events taking place over a minute later, and is of an officer standing next to a van already closed, with the Decedent presumptively inside:



4.     Notably, "[u]nknown deputies had installed black plastic across the wall of the driver's compartment of the van in which Martinez was riding in.  The opaque plastic prevented Deputy Sharkey from seeing the compartment [in which the Decedent was contained] behind him."  Bedard Disclosure at ¶ 18.  The following is a picture of the black plastic:



According to Sharkey, the black bag was "put [] up so the inmate couldn't see where— you know, out the front windows.  So they could not see where they were going," and that the bag had been there "as far as I can remember."  Sharkey Dep. Tr. at 28:15-23, [D.E. 46 at

*CASE NO. 2:16-cv-14422-XXXX*
*Page 5*

Exhibit B thereto].  Indeed, as testified to by Sharkey, the placement of the black bag over the window was a "departmental decision."  Sharkey Dep. Tr. at 30:5-11.

5.    Further, "[m]ultiple seatbelts were fastened to the bench seating in the compartment that [the Decedent] rode." Bedard Disclosure at ¶ 19.  "[The Decedent] was reportedly not fastened in during the transport."  Bedard Disclosure at ¶ 20.  A picture of the compartment with multiple seatbelts as follows:



The fact that the Decedent was likely not fastened in was confirmed by Sharkey himself:

Q.    Is there a reason to have him buckled or not buckled?

A.    We usually give them the option.  If you want to be buckled in, you can buckle yourself in.

Q.    Generally speaking—not Mr. Martinez—if an inmate wants to be buckled while in a separate partition, is that something that that inmate needs to do himself?

A.    Yeah.

Q.    That's not something that you walk in there and then buckle him in?

A.    No.

Sharkey Dep. Tr. at 39:12-22.

6.     "Deputy Sharkey, after placing [the Decedent] in the van, then left the sally port and went inside the jail for what he estimated was several minutes."  Bedard Disclosure at ¶ 21.  "Deputy Sharkey did not lock the van door or the cage door that provided access to [the Decedent]."  Bedard Disclosure at ¶ 22.  "Several inmates who rode in the back compartment of van #118 said they could hear [the Decedent] coughing and hacking."  Bedard Disclosure at ¶ 23.  Specifically:

a.   "Inmate Shelvick Henry stated that he heard sounds coming from [the Decedent] that sounded like he was having breathing problems."  Bedard Disclosure at ¶ 24.

b.   "Inmate Arthur Sanders stated that he heard [the Decedent] making coughing and hacking noises."  Bedard Disclosure at ¶ 25.

c.   "Inmate Brandon Gilley stated that [the Decedent] was having a difficult time breathing and that it sounded like the was 'gurgling.'"  Bedard Disclosure at ¶ 26.

7.     "After a couple of minutes, Deputy Sharkey returned to the van and drove it to the Indian River County Jail that was 3.7 miles away.  The van left the courthouse at 11:17 a.m."  Bedard Disclosure at ¶ 27.  "IRC Deputy Garry Chambliss drove a white passenger vehicle behind the transport van.  He was escorting a female prisoner.  Both vehicles drove straight to the IRC jail without delay.  They arrived at 11:25 a.m."  Bedard Disclosure at ¶¶ 28-29.

8.     "When the transport vehicles arrived at the IRC jail, they pulled into the jail's sally port."  Bedard Disclosure at ¶ 30.  "Deputy Chambliss removed the female inmate" and "Deputy Sharkey opened the rear compartment of the van and escorted the seven inmates held there into the jail at 11:28 a.m."  Bedard Disclosure at ¶¶ 31-32.  "Within seconds of bringing the seven inmates inside the jail, Deputy Sharkey then returned to the van and opened the door to the compartment that held [the Decedent]."  Bedard Disclosure at ¶ 33.  The following occurred:

    a.   "Deputy Sharkey said the he immediately saw [the Decedent] lying down."  Bedard Disclosure at ¶ 34.

    b.   "Deputy Sharkey stated that [the Decedent] did not respond to verbal directions."  Bedard Disclosure at ¶ 35.

    c.   "Deputy Sharky stated that [the Decedent] remained unresponsive" and he "used his issued radio to summon help."  Bedard Disclosure at ¶¶ 37-38.

    9.    At 11:30 a.m., several IRC jail staff members entered the sally port area to assist Deputy Sharkey, and "[the Decedent] was removed from the van at 11:31 a.m. and placed on the sally port floor where jail staff began to administer CPR."  Bedard Disclosure at ¶¶ 39-40.  "EMS were summoned and arrived at 11:35 a.m."  Bedard Disclosure at ¶¶ 41-42.  "At 11:45, EMS left the sally port of the IRC jail and transported [the Decedent] to the IRC Medical Center Emergency room."  Bedard Disclosure at ¶ 43.  "[The Decedent] was admitted into the Surgical Intensive Care Unit (SICU)" and died five days later.  Bedard Disclosure at ¶¶ 44-45.

**Cause of Death**

    10.    The IRC's Chief Medical Examiner, Dr. Roger E. Mittleman, M.D. ("Mittleman"), conducted an autopsy.  *See* Chief Medical Examiner's Report, [D.E. 46 at Exhibit C thereto].  He noted that the cause of death was "cardiac dysrhythmia" due to "adverse drug reaction (Adderall) during treatment for Adult Attention Deficit Disorder."  *Id.*

    11.    Dr. William R. Anderson, M.D. ("Anderson") conducted a second autopsy.  "His findings were significantly different."  Bedard Disclosure at ¶ 54.  Anderson's reported "Cause of Death" was: "Hypoxic Encephalopathy, Diffuse, Post-Respiratory Arrest Secondary to Blunt Force Trauma, Neck."  Anderson Autopsy Report at p. 1, [D.E. 46 at Exhibit D thereto].  "Anderson noted significant abrasions extending circumferentially, involving most of the neck."  Bedard Disclosure at ¶ 56.  "These described abrasions are apparent to the naked eye and appear in multiple photographs taken while the [the Decedent] was in the hospital."  Bedard Disclosure

at ¶ 57.   Further, "Anderson completely dissected the larynx, which Dr. Mittleman failed to do. He noted an acute fracture with partial dislocation and associated hemorrhage extending into the soft tissues lateral to the area of the fracture."  Bedard Disclosure at ¶ 58.  "An area of contusion with associated hemorrhage was also noted in the left lateral chest at the level of ribs 5-7."  Bedard Disclosure at ¶ 59.

12.    Mariusz Ziejewski, Ph.D. Inz., a biomechanical engineer, submitted an expert report, and "the results from the analysis performed based on objective evidence is consistent with the opinion of Dr. William Anderson," i.e., "[t]he width of the abrasion marks to [the Decedent's] neck coincide with the width of the seatbelt webbing."  *See* Ziejewski Expert Report at pp. 1-5, [D.E. 46 at Exhibit E thereto].  Further, "[t]he width of the abrasion marks to [the Decedent's] neck, of 46 mm, is shown in Figure 1. A detailed analysis of tissue flow indicates tissue displacement.  The deformation of the outer surface of the skin indicate some relative motion of the object and the neck, as shown in Figure 2."  Ziejewski Expert Report at p. 3. "Figure 1" and "Figure 2" are:



Figure 1- Elongated Abrasions Located on Mr. Martinez's Neck



Figure 2- Tissue Flow on Mr. Martinez's Neck Indicating Relative Motion

Ziejewski Expert Report at p. 3.  By contrast, "[t]he width of the seatbelt webbing is 46 mm, also

shown in Figure 5, thus matching the geometry of the abrasion marks on Mr. Martinez's neck."

Ziejewski Expert Report at p. 4.  In particular:



Figure 5- Width of Mr. Martinez's Shirt Collar in Comparison to Width of Seatbelt

Ziejewski Expert Report at p. 5.

**Bedard's Opinion as to Liability**

13.    Bedard opined, in pertinent part, as follows:

Defendant Deputy Sharkey assumed custody of Mitchell Brad Martinez at the IRC Courthouse when he received him from the intake area for a transport to the jail. ***Sharkey, a sworn corrections officer had a legal duty to protect Martinez while he was in the custody of the Indian River Sheriff's Department.***

. . . .

A large opaque plastic sheet was intentionally installed in the van between the driver's compartment and the forward holding cell compartment. Deputy Sharkey alleged in deposition that it was placed there by unknown deputies to prevent inmates from seeing where they were going.  Deputy Sharkey had previously tacked the sheet up when it had fallen. ***Deputies knew or should have known that placing this opaque sheet up would have the effect of also preventing them from seeing into the forward compartment where inmates were kept. Because of this, Deputy Sharkey was not aware of the medical crises that Martinez was suffering during the transport.***

. . . .

Deputy Sharkey failed to continuously monitor and protect Martinez. It is all the more disturbing that the sally port cameras appear to have "skipped" during this critical time frame.

. . . .

The photos taken of Martinez at the hospital are disturbing. Abrasions, apparent to the naked eye can be seen around Martinez's neck. There is a pattern in his skin that closely

resembles the fabric of the seatbelts that are in transport van #1189. It appears that the crime scene technician also noticed the similarities as the belt fabric and the skin abrasions have been meticulously photographed against a forensic ruler. Martinez had significant petechial hemorrhaging in both eyes, a phenomenon commonly observed in ligature strangulation deaths (Strack & McClane, 1998). ***The fractured and dislocated larynx later discovered by Dr. Anderson further suggests violent trauma to the throat area.  Though there are significant photos captured by the crime scene technician that might suggest strangulation or some other form of neck trauma,*** it is troubling that none of the photos or forensic artifacts are mentioned in Det. Ryan's investigation report.

        . . . .

        ***With respect to the Plaintiff's claims, if the cause of death was suicide, homicide or natural causes, Deputy Sharkey was responsible for protecting Martinez. By leaving Martinez unprotected and unobserved Deputy Sharkey failed to provide a duty owed to Martinez as a prisoner of the Indian River County Sheriffs Office.*** The use of an opaque plastic sheet to intentionally obscure vision prevented Sharkey from seeing into the forward compartment or from allowing Martinez to see out. This practice or custom shows deliberate indifference and callous disregard for the safety of the prisoners that are under the control of the Indian River Sheriff's Department. Critical safety equipment that was installed in the transport van was either out of service (cameras and recording devices) or intentionally not used (seatbelt restraints). The transport method described by Deputy Sharkey appears proximate to the injuries and ultimate death suffered by Mitchell Brad Martinez.

## SUMMARY OF OPINIONS

        . . . .

3. ***Deputies of the IRC were negligent by intentionally placing an opaque plastic sheeting over the wall separating the driver's compartment from the forward holding compartment.*** Deputy Sharkey was complicit in allowing this plastic sheet to remain in place. If this sheeting were not in place, Deputy Sharkey would have likely seen Martinez in distress and would have been able to provide life saving first responder assistance.

        . . . .

5. ***The Indian River County Sheriff's Office owed a legal duty to Martinez to protect him from harm while in law enforcement custody.***

6. Several of the other inmates heard Martinez have difficulty breathing. Deputy Sharkey should have heard or been able to visually observe Martinez as he coughed, gasped, gurgled and reportedly had trouble breathing.

7. ***The presence of seat belts in a vehicle suggests that they are in place for prisoner safety. Deputy Sharkey had a custom of not taking full advantage of all safety equipment that is provided for the protection of passengers.***

8. ***When Deputy Sharkey retreated from the transport van into the jail, he failed to lock and fully secure the access doors to Martinez.*** Prisoners in custody should always be fully secured in a locked containment when not in the immediate observable presence of an officer.

Bedard Disclosure at pp. 15-21 (emphasis added). Bedard also opined, via deposition testimony:

Q.      Is there a standard of which you are aware imposed on transportation staff as to whether seat belts are or are not to be used during the transport of inmates?

A.      There is an emerging standard of care.

Q.      Existing.

A.      Yes. It depends. Not necessarily -- I can't find anywhere in the IRC policy, which I think is a problem for the agency, by the way, because especially after for instance Freddie Gray, there still isn't a change in their policy, as I understand it, to now reflect that you should seat belt people in.

Q.      Is there a national standard that imposes that obligation?

A.      There is no such thing as a national standard for anything. There are emerging standards that are sort of majority opinion or best practice, as it's often called. And best practice is to utilize all existing safety equipment for prisoners, because ultimately the deputy is held to a standard of ultimate care. They are held to the standard that anything that happens to them -~

Q.      What's the duty?

A.      They have a duty to protect them.

Q.      Protect from what?

A.      Everything.

Q.      That's your understanding of the duty?

A.      My understanding is that they are to protect them and deliver them safely. They have a special relationship. Unlike somebody who is not in the custody of a law enforcement agency, a deputy is required to protect a person who is within their custody. Now, when you say protect, it's somewhat of a vague term, but reason tells us that it would be to protect them from everything. To deliver a live person live would be a simple requirement and duty of a law enforcement officer. That did not happen in this case.

Bedard Dep. Tr. at 57:13-25, 58:1-25, 59:1-15, [D.E. 46 at Exhibit F thereto].

<u>**Memorandum of Law**</u>

## I.  **Standard of Review**

"This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party." *Drury v. Cardiac Pacemakers, Inc.*, 2003 WL 23319650, at *1 (M.D. Fla. June 3, 2003) (citing *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983)). "All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party." *Id.* "Factual disputes preclude summary judgment." *Id.*

## II.  **Summary Judgment is Improper as to the Plaintiff's Claim Brought Against Defendant Loar in his Official Capacity as Sheriff Pursuant to 42 U.S.C. § 1983 Because There are Genuine Issues of Material Fact as to Whether the IRC Sheriff's Office Caused the Decedent's Death by Failing to Train and Supervise its Employees in the Transport of Persons in Custody and in the Use of Force.**

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the U.S. Supreme Court held that a municipality may be liable under § 1983 if it has a policy or custom that causes a violation of the plaintiff's federal rights.  Order on Defs.' Mots. To Dismiss at p. 7, [D.E. 30].  "[W]here a municipality's failure to train its employees in a relevant respect

evidences a 'deliberate indifference' to the rights of its inhabitants [] such a shortcoming [may] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

To establish "deliberate indifference," a "plaintiff must show that the municipality had 'notice of a need to train or supervise in a particular area and the municipality made a deliberate choice not to take action.'" *Id.* (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998)). "'A city may be put on notice in two ways.'" *Id.* (quoting *Lewis v. City of W. Palm Bch., Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009)). "'First, if the city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered deliberately indifferent.'" *Id.* (quoting *Lewis*, 561 F.3d at 1293 (citing *Gold*, 151 F.3d at 1351)). "'Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious.'" *Id.* at 8 (footnote omitted) (quoting *Lewis*, 561 F.3d at 1293 (citing *Gold*, 151 F.3d at 1351-52)). "'The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.'" *Id.* (quoting *Bd. of City Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409-10 (1997)).

For example, in this Court's Order on the Defendants' Motions to Dismiss, it held:

> Plaintiff alleges that Sheriff Loar's decision not train his deputies on proper transport and use of force reflects deliberate indifference to the rights of those in custody. Plaintiff alleges that transport vans are equipped with lengthy lap seatbelts and that persons remain restraining during transport. In addition, Plaintiff alleges that the vans contain a separate compartment out of sight of other inmates and the driver. Finally, Plaintiff alleges an atmosphere of excessive force in the Sheriff's Office. Based on these allegations, Plaintiff states a claim against Sheriff Loar under § 1983 for failure to train.

*Id.*

Likewise, based on the summary judgment evidence, this Court should conclude that there remain genuine issues of material facts as to whether the IRC Sheriff's Office exercised deliberate indifference in failing to train and supervise its employees in the transport of persons in custody and in the use of force, causing the Decedent's death. Specifically, under the circumstances, the likelihood for a constitutional violation was so high that the need for training was obvious, rendering summary judgment improper as to the Plaintiff's § 1983 claim.

Indeed, as is undisputed, the Decedent was cuffed and placed into the transport van, "into a solitary compartment directly behind the driver's compartment." Bedard Disclosure at ¶¶ 14-15. "Though surveillance cameras were installed in the sally part, the video froze intermittently as [the Decedent] was about to enter the van." Bedard Disclosure at ¶ 16. As is undisputed, "[u]nknown deputies had installed black plastic across the wall of the driver's compartment of the van in which Martinez was riding in. The opaque plastic prevented Deputy Sharkey from seeing the compartment [in which the Decedent was contained] behind him." Bedard Disclosure at ¶ 18. According to Sharkey, the black bag was "put [] up so the inmate couldn't see where— you know, out the front windows. So they could not see where they were going," and that the bag had been there "as far as I can remember." Sharkey Dep. Tr. at 28:15-23. In fact, reflecting the obvious need for better training was the fact that, as testified to by Sharkey, the placement of the black bag over the window was a "departmental decision." Sharkey Dep. Tr. at 30:5-11.

Further, as is undisputed, "[m]ultiple seatbelts were fastened to the bench seating in the compartment that [the Decedent] rode." Bedard Disclosure at ¶ 19. "[The Decedent] was reportedly not fastened in during the transport." Bedard Disclosure at ¶ 20. The fact that the Decedent was likely not fastened in was confirmed by Sharkey himself, along with his testimony showing an obvious need for training regarding the use of the safety belts:

*CASE NO. 2:16-cv-14422-XXXX*
*Page 16*

> Q.      Is there a reason to have him buckled or not buckled?
>
> A.      We usually give them the option.  If you want to be buckled in, you can buckle yourself in.
>
> Q.      Generally speaking—not Mr. Martinez—if an inmate wants to be buckled while in a separate partition, is that something that that inmate needs to do himself?
>
> A.      Yeah.
>
> Q.      That's not something that you walk in there and then buckle him in?
>
> A.      No.

Sharkey Dep. Tr. at 39:12-22.  As testified to by Bedard, such inaction was a violation of the

standard of care for deputies, or, at the very least, a failure to adhere to best industry practices

regarding the transport of inmates, reflecting an obvious need for better training:

> Q.      Paragraph 19, you recite that there were multiple seat belts.  How many is multiple?
>
>          . . . .
>
> A.      I didn't think it was important.  They are there.  The point I'm making is that they were safety equipment that was installed in the van, not so much to say that there was one or ten, but rather that they were obviously there and unused.
>
> Q.      Is there a standard of which you are aware – do you want me to shut up while you're looking at that? Because I will.
>
> A.      No. Go ahead.
>
> Q.      Is there a standard of which you are aware imposed on transportation staff as to whether seat belts are or are not to be used during the transport of inmates?
>
> A.      There is an emerging standard of care.
>
> Q.      Existing.
>
> A.      Yes. It depends. Not necessarily -- I can't find anywhere in the IRC policy, which I think is a problem for the agency, by the way, because especially

after for instance Freddie Gray, there still isn't a change in their policy, as I understand it, to now reflect that you should seat belt people in.

Q.    Is there a national standard that imposes that obligation?

A.     There is no such thing as a national standard for anything. There are emerging standards that are sort of majority opinion or best practice, as it's often called. And best practice is to utilize all existing safety equipment for prisoners, because ultimately the deputy is held to a standard of ultimate care. They are held to the standard that anything that happens to them -~

Q.    What's the duty?

A.    They have a duty to protect them.

Q.    Protect from what?

A.    Everything.

Q.    That's your understanding of the duty?

A.    My understanding is that they are to protect them and deliver them safely. They have a special relationship. Unlike somebody who is not in the custody of a law enforcement agency, a deputy is required to protect a person who is within their custody.

Now, when you say protect, it's somewhat of a vague term, but reason tells us that it would be to protect them from everything. To deliver a live person live would be a simple requirement and duty of a law enforcement officer. That did not happen in this case.

Bedard Dep. Tr. at 57:13-25, 58:1-25, 59:1-15.

Moreover, as is undisputed, "Deputy Sharkey, after placing [the Decedent] in the van, then left the sally port and went inside the jail for what he estimated was several minutes." Bedard Disclosure at ¶ 21.  "Deputy Sharkey did not lock the van door or the cage door that provided access to [the Decedent]."  Bedard Disclosure at ¶ 22.  "Several inmates who rode in the back compartment of van #118 said they could hear [the Decedent] coughing and hacking." Bedard Disclosure at ¶ 23.  Specifically:

    a.      "Inmate Shelvick Henry stated that he heard sounds coming from [the Decedent] that sounded like he was having breathing problems." Bedard Disclosure at ¶ 24.

    b.      "Inmate Arthur Sanders stated that he heard [the Decedent] making coughing and hacking noises." Bedard Disclosure at ¶ 25.

    c.      "Inmate Brandon Gilley stated that [the Decedent] was having a difficult time breathing and that it sounded like the was 'gurgling.'" Bedard Disclosure at ¶ 26.

Hence, as Bedard opined and stated:

- If the cause of death was homicide or natural causes, Deputy Sharkey was responsible for protecting Martinez. By leaving Martinez unprotected and unobserved Deputy Sharkey failed to provide a duty owed to Martinez as a prisoner of the Indian River County Sheriffs Office.

- Deputies of the IRC were negligent by intentionally placing an opaque plastic sheeting over the wall separating the driver's compartment from the forward holding compartment. Deputy Sharkey was complicit in allowing this plastic sheet to remain in place. If this sheeting were not in place, Deputy Sharkey would have likely seen Martinez in distress and would have been able to provide life saving first responder assistance.

- The Indian River County Sheriff's Office owed a legal duty to Martinez to protect him from harm while in law enforcement custody.

- The presence of seat belts in a vehicle suggests that they are in place for prisoner safety. Deputy Sharkey had a custom of not taking full advantage of all safety equipment that is provided for the protection of passengers.

- When Deputy Sharkey retreated from the transport van into the jail, he failed to lock and fully secure the access doors to Martinez.

Bedard Disclosure at pp. 19-21 (emphasis added).

      Accordingly, based on the summary judgment evidence, this Court should conclude that there remain genuine issues of material facts as to whether the IRC Sheriff's Office exercised deliberate indifference in failing to train and supervise its employees in the transport of persons in custody and in the use of force, causing the Decedent's death. Specifically, under the

circumstances, the likelihood for a constitutional violation was so high that the need for training

was obvious, rendering summary judgment improper as to the Plaintiff's § 1983 claim.

III.   **Based on the Summary Judgment Evidence, the Court Should Conclude that There Remains Genuine Issues of Material Facts as to Whether Loar is Liable for Negligence Based on His Failure to Train and Supervise his Deputies on How to Safely Transport Persons Within the Custody of the IRC Sheriff's Office.**

"'To state a claim for negligence under Florida law, a plaintiff must allege that the

defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the

breach caused the plaintiff to suffer damages.'"   Order on Defs.' Mots. to Dismiss at p. 8

(quoting *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing *Paterson

v. Deeb*, 472 So. 2d 1210, 1214 (Fla. 1st DCA 1985)).   "'[A]n employer is liable in tort for

reasonably foreseeable damages resulting from the negligent training of its employees and

agents.'"   *Id.* at p. 9 (quoting *Lewis*, 260 F.3d at 1265 (citing *McFarland & Son, Inc. v. Basel*,

727 So. 2d 266 (Fla. 5th DCA 1999)).   Specifically, under Florida law, officers and their

employers have a duty of care with respect to those in their custody.   *See Mercado v. City of

Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005).   Further, "[n]egligent supervision occurs when

during the course of employment, the employer becomes aware or should have become aware of

problems with an employee that indicated his unfitness, and the employer fails to take 'corrective

action.'"   *Id.* (quoting *Dep't of Envtl. Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005)).

In this case, as discussed in the previous argument section of this Response, based on the

summary judgment evidence, there are genuine issues of material fact as to whether Loar

negligently failed to train and supervise his employees in the transport of persons in custody and

in the use of force, causing the Decedent's death.   Accordingly, as to the Plaintiff's negligence

claim against Loar, this Court should deny Loar's Motion for Summary Judgment.

IV. **Summary Judgment is Not Proper as to the Plaintiff's Negligent Training Claim Against Loar Because Loar is Not Entitled to Sovereign Immunity, as it Was Not a "Discretionary" Function.**

Loar contends that sovereign immunity bars the Plaintiff's negligent failure to train claim because the Plaintiff criticizes the content of the training programs, i.e., a "discretionary" function. "Under Florida law, sovereign immunity bars tort suits against a state entity, including a municipality, arising from a discretionary government function." Order on Defs.' Mots. to Dismiss at p. 9, [D.E. 30] (citing *Commercial Carrier Corp. v. Indian River Cty.*, 371 So. 2d 1010, 1022 (Fla. 1979); *Everton v. Willard*, 468 So. 2d 936, 938 (Fla. 1985)). "Discretionary functions are 'planning' level decisions that determine policy, in contrast to 'operational' decisions on how to implement planning level decisions." *Id.* (citing *Commercial Carrier*, 371 So. 2d at 1021). "The purpose of this distinction is to identify those government acts that 'involve[] an exercise of executive or legislative power such that a court's intervention by way of tort law would inappropriately entangle the court in fundamental questions of policy and planning.'" *Id.* at pp. 9-10 (quoting *Mosby v. Harrell*, 909 So. 2d 323, 328 (Fla. 1st DCA 2005)) (citing *Commercial Carrier Corp.*, 371 So. 2d at 1021).

In *Lewis*, for example, the Eleventh Circuit explicitly held that the discretionary function exception prohibited the plaintiff from challenging "the City's policy decisions regarding what to include in the training of its police officers." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001). "In contrast to *Lewis*, Plaintiff challenges Sheriff Loar's deliberate indifference in failing to train his deputies." Order on Defs.' Mots. to Dismiss at p. 10, [D.E. 30]. Specifically, Plaintiff does not challenge the policy decisions regarding what was or was not included in the training of Loar's deputies; but rather, challenges the fact that there were not, indeed, trained properly. Rather, the Plaintiff contends that Deputy Sharkey was negligently

trained because:  (1) he failed to actually fasten in the Decedent with the available multiple seatbelts when he placed him in the van's solitary compartment (instead, leaving it as an option for the Decedent); (2) he allowed a black plastic bag to obstruct his view of the Decedent while in the solitary compartment; (3) he left the Decedent unsecured in the sally port for several minutes, not locking the van or cage door that provided access to the Decedent; and (4) he failed to check on the Decedent before or during the transport from the courthouse to the jail.

As such, the Plaintiff's challenge goes to the fact that Loar negligently trained his supervisors, an operational level decision, and not as to what was included in the training program, i.e., a discretionary or planning level decision.  Accordingly, the Plaintiff's claim that Loar negligently failed to train his deputies is not precluded by sovereign immunity.

WHEREFORE, the undersigned respectfully requests that the Court enter an Order denying Sheriff Loar's Motion for Summary Judgment; and grant such other relief that it deem just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11, 2017, I e-filed this document using the CM/ECF system.  I further certify that I am unaware of any non-CM/ECF participants.

/s/ *Arye P. Corbett*
Kevin Smith, Esquire
Florida Bar No.:  861030
Attorneys for Plaintiff
Lytal, Reiter, Smith, Ivey & Fronrath
515 N. Flagler Drive, 10th Floor
West Palm Beach, FL  33401
Telephone: (561) 655-1990
Facsimile:  (561) 832-2932
Email:  acorbett@foryourrights.com
Email: aryan@foryourrights.com